258 P.3d 704 (2011)
2011 WY 119
In the Matter of the Termination of Parental Rights to: ARC and RMR, Minor Children, TMC, Appellant (Respondent),
v.
The State of Wyoming, Department of Family Services, Appellee (Petitioner).
No. S-10-0254.
Supreme Court of Wyoming.
August 22, 2011.
*706 Representing Appellant: Gregory L. Winn, Laramie, Wyoming.
Representing Appellee: Gregory A. Phillips, Wyoming Attorney General; Robin Sessions Cooley, Deputy Attorney General; Jill E. Kucera, Senior Assistant Attorney General. Argument by Ms. Cooley.
Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.
KITE, Chief Justice.
[¶ 1] TMC (Mother) appeals from the district court's order terminating her parental rights to ARC and RMR. She claims the State of Wyoming, Department of Family Services (DFS) failed to present clear and convincing evidence that it made reasonable efforts to rehabilitate the family, the children's health and safety would be seriously jeopardized by returning the children to her, or that she was unfit to have care and custody of the children.
[¶ 2] We affirm.

ISSUES
[¶ 3] Mother presents the following issues on appeal:
1. Whether [DFS] proved, by clear and convincing evidence that [Mother] was an unfit parent?
2. Whether [DFS] proved, by clear and convincing evidence that [it] made reasonable efforts [to] rehabilitate the family as required by W.S. § 14-2-309(a)(iii)?
3. Whether [DFS] proved, by clear and convincing evidence that the children's health and safety would be seriously jeopardized if they returned to [Mother]?
DFS's statement of the issues on appeal is similar.

FACTS
[¶ 4] Mother has two children, ARC and RMR. In March 2008, she and the children were living with JKR, who is the father of RMR, in his home in Mills, Wyoming. JKR's daughter from another relationship, TRR, was also living in the home. At that time, ARC was not quite three years old, RMR was thirteen months old, and TRR was five years old.
[¶ 5] Mills police officers attempted to serve a warrant on a person they thought lived in a trailer house located on the same property as JKR's house. When no one answered at the trailer, they went to JKR's house to inquire about the trailer's occupants. *707 TRR answered the door and indicated to the officers that she and ARC were home alone. Concerned about the children being left unsupervised, the officers called DFS, which sent an investigator to the residence.
[¶ 6] The officers and DFS investigator entered the residence and immediately observed illegal drugs and drug paraphernalia in the living room where the children had been watching television. The officers went through the rest of the house to see if there were other children. They found JKR asleep in the back bedroom. He was taken into custody and the house was searched for further evidence of drugs. Law enforcement found more drugs, drug paraphernalia, a large amount of cash, and a stolen firearm.
[¶ 7] While the officers were at the house, Mother arrived with RMR. DFS took all three children into protective custody and placed them in foster care. The parents were alleged to have neglected the children by exposing them to illegal drugs and drug paraphernalia. The neglect allegations were substantiated by DFS, and the parents eventually stipulated to an adjudication that they had neglected the children.
[¶ 8] DFS and Mother agreed to a family service plan, dated May 29, 2008, and amended on June 23, 2008, which stated the permanency goal as family reunification and required her to submit to urinary analyses (UA) six times per week; complete a substance abuse assessment and comply with its recommendations; establish safe and stable housing suitable for the children; find and maintain legal employment; attend parenting classes and domestic violence counseling; and attend visitation and school and medical appointments with the children.
[¶ 9] Mother performed very few of the tasks on the family service plan. She missed many UAs, and of those she submitted, many were positive for illegal substances. Although she completed the substance abuse assessment, she did not comply with its recommendation of intensive outpatient treatment. She also did not provide any documentation showing she had attended parenting or domestic violence classes or had obtained legal employment. She did attend some visits with the children, although not nearly as many as were scheduled by DFS.
[¶ 10] A second family service plan was executed on October 29, 2008. That plan listed the permanency goal as family reunification, but also stated a concurrent goal of guardianship or adoption. This plan required Mother to attend an intensive outpatient substance abuse program until she could get into inpatient treatment; immediately establish a bed date for inpatient substance abuse treatment; complete inpatient treatment and follow all recommendations, including aftercare; and submit to UAs six times per week. The other requirements of the plan remained the sameattend parenting and domestic violence classes/counseling; attend all visitations; establish a safe and stable home; and secure and maintain legal employment. She was required to provide DFS with documentation of her compliance with these requirements.
[¶ 11] The children were originally placed in non-relative foster care; however, they were transferred to foster care with relatives in January 2009. One of the permanency options was for the relative placement to become a guardianship. However, that situation did not work out and the children were transferred back to the original foster family in August 2009, where they have remained.
[¶ 12] Because Mother continued to fail to follow the requirements of her family service plan, the district court approved a permanency plan after a review hearing on April 22, 2009, which provided for termination of her parental rights and guardianship or adoption of the children. Finally, on June 3, 2009, Mother entered inpatient substance abuse treatment. She did not, however, complete the program. The State filed petitions to terminate her parental rights to ARC and RMR on August 21, 2009. The termination actions were consolidated, and, after an evidentiary hearing, the district court terminated Mother's parental rights to ARC and RMR.[1] Mother appealed.

*708 STANDARD OF REVIEW
[¶ 13] Mother challenges the sufficiency of the evidence to support the district court's decision to terminate her parental rights.
[W]e apply our traditional principles of evidentiary review when a party challenges the sufficiency of the evidence supporting termination. Thus, we examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party.
SLB v. JEO, 2006 WY 74, ¶ 7, 136 P.3d 797, 799-800 (Wyo.2006), quoting SLJ v. Dep't of Family Servs., 2005 WY 3, ¶ 19, 104 P.3d 74, 79-80 (Wyo.2005). See also, CL v. Wyo. Dep't of Family Servs., 2007 WY 23, ¶ 8, 151 P.3d 1102, 1105 (Wyo.2007).
[¶ 14] In applying our standard of review, we keep in mind that the right to associate with one's family is fundamental and strictly scrutinize petitions to terminate a parent's rights to his or her children. CL, ¶ 9, 151 P.3d at 1105; SLB, ¶ 7, 136 P.3d at 799-800; TF v. Dep't of Family Servs., 2005 WY 118, ¶ 15, 120 P.3d 992, 1000 (Wyo.2005). DFS has the obligation to establish by clear and convincing evidence that termination is appropriate. SLJ, ¶ 19, 104 P.3d at 79-80. "`Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of the contention is highly probable.'" Id., quoting MN v. Dep't of Family Servs., 2003 WY 135, ¶ 5, 78 P.3d 232, 234 (Wyo.2003).

DISCUSSION
[¶ 15] The termination action against Mother was based upon Wyo. Stat. Ann. § 14-2-309(a)(iii) and (v) (LexisNexis 2011):
(a) The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence:
....
(iii) The child has been abused or neglected by the parent and reasonable efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent;
....
(v) The child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months, and a showing that the parent is unfit to have custody and control of the child[.]

A. Section 14-2-309(a)(iii)
[¶ 16] DFS is charged with proving three elements in order to justify a termination action under § 14-2-309(a)(iii): "(1) abusive treatment or neglect by the parent; (2) unsuccessful [reasonable] efforts to rehabilitate the family; and (3) the child's health and safety would be seriously jeopardized by remaining with or returning to the parent." RS v. Dep't of Family Servs., 2004 WY 87, ¶ 12, 94 P.3d 1025, 1028 (Wyo.2004). See also, CL, ¶ 11, 151 P.3d at 1105. The district court ruled on each of the elements as follows:
9. Pursuant to Wyo. Stat. Ann. § 14-2-309(a)(iii), the Court finds by clear and convincing evidence that the children have been neglected by [Mother]. [Mother] failed to provide adequate care for the children. She left the children in the care of [JKR], in a home that contained many hazards including drug paraphernalia, drug residue, pill bottles, and needles in reach of the children. Additionally, [Mother] failed to comply with her case plan.
10. The Court finds that clear and convincing evidence has been presented to show, pursuant to Wyo. Stat. Ann. § 14-2-309(a)(iii), reasonable efforts by the authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment. [Mother] was provided with various components and assistance, and [she] has failed to recognize her own issues and addictions, and has failed to complete drug treatment, and domestic violence counseling.

*709 11. The Court further finds by clear and convincing evidence that the children's health and safety would be seriously jeopardized by remaining with or returning them to [Mother]. [Mother] still has not completed drug treatment. Her assertion of abstinence from drug use is suspect. The children had many issues when they came into care, but have shown a change for the better in the absence of being in the home of [Mother]. [Mother] has shown a failure to recognize her drug addiction and issues.
[¶ 17] Mother does not challenge the finding of neglect on appeal. Indeed, she stipulated to an adjudication of neglect in June 2008. Mother does challenge the district court's finding that clear and convincing evidence showed DFS provided reasonable efforts to rehabilitate her. The record reflects that DFS prepared two family service plans for Mother. The plans included provisions for Mother to obtain and maintain sobriety, including substance abuse assessment, treatment and UAs to monitor her progress. DFS assisted her with obtaining the assessment and making arrangements for intensive outpatient treatment. Although Mother completed the assessment, she did not complete her intensive outpatient program and was terminated, twice. In addition, DFS attempted to help her obtain a bed date for inpatient treatment, but she did not follow through until June of 2009.
[¶ 18] DFS entered into a contract with a drug testing service for Mother to undergo UAs six times per week, but she appeared for testing only occasionally. The family service plans provided for Mother to complete parenting classes and domestic violence counseling. She did not, however, avail herself of those opportunities. In addition, DFS provided other services to the children and Mother, including multidisciplinary team (MDT) meetings, foster care, counseling, and supervised visitation.
[¶ 19] Mother challenges the reasonableness of DFS's efforts by stating that DFS did not maintain the UA drug testing contract after December 2008, did not tell her about the children's school and medical appointments, did not hold an MDT meeting for over a year, and did not inspect her house to see the work she had done to make it suitable for the children. The record does not support Mother's assertion that these factors mandated a finding that DFS's efforts were not reasonable.
[¶ 20] DFS's contract for Mother's UA testing expired in December 2008. It was reasonable for DFS not to renew it considering she appeared for testing so infrequently. An employee of the drug testing service testified that Mother could have made her own arrangements for drug testing even after the contract was terminated, but did not. Further, Mother does not direct us to any evidence in the record indicating she requested that DFS continue the drug testing contract.
[¶ 21] As Mother points out, there was evidence that DFS did not always provide her with information about the children's school and medical appointments and it failed to hold an MDT meeting for over a year, from January 7, 2009 to March 22, 2010. Even if we assume DFS could have done more in those respects, we cannot state that its overall efforts were unreasonable. Mother apparently did not request that the MDT be convened and although she had the opportunity to meet with at least some of the team members at court hearings on April 22, 2009 and October 9, 2009 she did not attend the hearings. We conclude, therefore, her complaints in this regard are somewhat disingenuous.
[¶ 22] Finally, Mother claims DFS did not make reasonable efforts because it did not inspect her house to determine if it was safe and suitable for the children. She testified that she had done some work on the house to make it more comfortable for the children. The DFS case worker testified that, had Mother complied with the other parts of her family service plan, DFS would have inspected her home when it started the reunification process. Until the time when actual family reunification was drawing closer, there was no reason to inspect her home. Under these circumstances, the district court properly concluded that DFS presented clear and convincing evidence it made reasonable efforts to reunite her with the children.
*710 [¶ 23] Mother makes an additional argument regarding DFS's efforts at reunifying her with the children. She claims DFS did not show that it attempted means less intrusive than termination of parental rights. In particular, she asserts DFS should have instituted a guardianship proceeding instead of terminating her parental rights.
[¶ 24] Under the strict scrutiny standard applicable to parental rights termination actions, the state is required to use the least intrusive means to accomplish the goal of protecting the children. See, e.g., LDC v. Dep't of Family Servs., 979 P.2d 953, 958 (Wyo.1999); DKM v. RJS, 924 P.2d 985, 987-88 (Wyo.1996); TR v. Washakie County Dep't of Public Assistance and Social Servs., 736 P.2d 712, 718 (Wyo.1987). Mother argues that DFS was required to pursue guardianship because it was less intrusive on her fundamental right to family association than termination of her parental rights. We have never determined whether guardianship is a less intrusive alternative to termination, see, e.g., AJJ v. State of Wyo., Dep't of Family Servs., 2010 WY 142, ¶ 21 n. 1, 242 P.3d 968, 973 n. 1 (Wyo.2010) (stating that it was unnecessary to resolve the issue in that case), and it is unnecessary to resolve the issue here because it is clear that DFS did, at one point, pursue a guardianship with relatives.
[¶ 25] The foster mother in the relative placement testified that she and her husband offered to pay the legal fees to have the guardianship established. That never came to fruition because the relatives' biological daughter had trouble adapting to having the foster children in their home. Nevertheless, it is clear that the guardianship option was considered and pursued. Mother does not direct us to any evidence that she specifically requested guardianship be considered after that. Under these circumstances, DFS did not fail to pursue less intrusive means of protecting the children.
[¶ 26] The last element of a subsection (iii) action requires a clear and convincing showing that the health and safety of the children would be seriously jeopardized by returning them to Mother. As we have already explained, Mother did not complete any aspect of her family service plans. The reason the children were removed from the home in the first place involved the parents' use of illegal drugs, including marijuana and methamphetamine, and the fact that drugs and paraphernalia were found in the house within reach of the children. Thus, the family service plans focused on addressing the drug issue.
[¶ 27] Mother was directed to demonstrate that she was not using illegal drugs by submitting to UAs six times per week. Over a several month period, she only occasionally showed up for UAs, many of which were positive for illegal drug use. Mother testified that she had not used drugs since the end of May 2009, but she did not submit any objective evidence of that. The district court specifically found her credibility as to her sobriety was suspect. Our standard of review requires that we defer to the district court's findings of credibility because it has the opportunity to observe the demeanor of the witness. AJJ, ¶ 20, 242 P.3d at 972.
[¶ 28] In order to address her substance abuse problem, Mother was directed to undergo treatment, both intensive outpatient and inpatient. She was terminated twice from the intensive outpatient program for failing to attend sessions. Although she eventually went to inpatient treatment, she did not do so until June 2009, many months after the family service plan required her to attend. Even then, she did not fully engage in the program and failed to complete it. Her discharge summary stated that her prognosis was "extremely poor ... due to her lack of willingness to accept responsibility and practice the recovery skills needed to maintain a long-term, quality sobriety." There was no evidence that she entered any type of treatment program after her unsuccessful stint at inpatient treatment.
[¶ 29] Mother argues that a parent's use of illegal drugs is not a sufficient basis for terminating parental rights and directs us to State of Wyoming, Dep't of Family Servs. v. TWE, 2009 WY 155, 222 P.3d 142 (Wyo.2009) as support for her position. In that case, the district court denied DFS's petition to terminate the father's parental rights. DFS refused *711 to return the children to the father, in part, because of his continuing use of marijuana. Id., ¶¶ 8-9, 222 P.3d at 144. The district court noted, and we agreed, that his marijuana use did not support termination because "the initial reason for DFS involvement with this family was not related to [the father's] marijuana use. It was due to the continued failure of the parents to provide sanitary living conditions and provide prompt and appropriate medical/dental care for the children." Id., ¶¶ 19, 22, 222 P.3d at 147-48. The evidence at the hearing established that the father's current home was appropriate and clean and the State had not demonstrated that the father's use of marijuana would seriously jeopardize the health and safety of the children. Id., ¶ 21, 222 P.3d at 147.
[¶ 30] TWE is distinguishable from the case at bar. Here, the children were removed because the parents' drug use presented a health and safety concern for the children. That issue had not been addressed by Mother at the time of the hearing. Unlike in TWE, there was an obvious connection between the welfare of the children and Mother's drug use. Wyoming law specifically recognizes the danger to children from illegal drugs, especially methamphetamine, which was Mother's drug of choice. Wyo. Stat. Ann. § 6-4-405 (LexisNexis 2011) makes it a crime to allow children to remain in a dwelling where methamphetamine is possessed. See generally, Butz v. State, 2007 WY 152, 167 P.3d 650 (Wyo.2007) (overruled on other grounds). Given the prevalence of methamphetamine (and other drugs) in the home when the children were taken into custody and Mother's unwillingness to properly address her substance abuse problem, her drug use was an appropriate basis for DFS intervention and termination of her parental rights.
[¶ 31] DFS presented several witnesses at the termination hearing who opined about whether it would be safe to return the children to Mother. The DFS case worker testified that she would be concerned about the children's health and safety if they were returned to Mother because, in addition to other things, she did not know if Mother was free of drugs and could care for the children. Leslie Murtagh, an advance practice child and adolescent psychiatric nurse, assessed and treated ARC and the older child in the household, TRR. When Ms. Murtagh was asked about whether it was safe for ARC to return to Mother's care, she stated it would be detrimental to his emotional well being. Jack Watters, the case manager for Court Appointed Special Advocates of Natrona County (CASA), testified that, based upon his training and experience, it would not be possible to place the children back with Mother because of her failure to comply with the family service plans. Both women who had been foster mothers to the children testified that the children would be harmed by returning to Mother.
[¶ 32] All in all, the record demonstrates, especially with regard to Mother's use and dependency on illegal drugs, nothing had changed from the time the children were removed from the home in March 2008 until the hearing in May 2010. While she claimed that she was not using illegal substances, the district court doubted her veracity about her drug use and there was absolutely no objective evidence in the record to support her claim. Moreover, and of equal importance, she had not successfully completed treatment to address the underlying issues that led to her substance abuse problem in the first place. The record, therefore, supports the district court's conclusion that DFS proved by clear and convincing evidence the children's health and safety would be seriously jeopardized by returning to Mother.

B. Section 14-2-309(a)(v)
[¶ 33] Our conclusion that the district court properly terminated Mother's parental rights under § 14-2-309(a)(iii) is dispositive because "[p]arental rights may be terminated on a finding of just one of the stated subsections enunciated in § 14-2-309." MN, ¶ 31, 78 P.3d at 239. However, we will briefly address the other basis for termination, § 14-2-309(a)(v).
[¶ 34] Under § 14-2-309(a)(v), DFS was required to prove two elements: the children had been in foster care under the State's responsibility for at least fifteen of the most recent twenty-two months; and the Mother *712 was unfit to have custody and control of them. CL, ¶ 12, 151 P.3d at 1106. See also, AJJ, ¶¶ 13-14, 242 P.3d at 970. There is no dispute regarding the first element. At the time of the hearing, the children had been in foster care under the State's responsibility for nearly twenty-six months. Our focus, then, is on the district court's finding that Mother was unfit to have custody and control of the children.
[¶ 35] In RLA v. State of Wyo., Dep't of Family Servs., 2009 WY 109, ¶ 14, 215 P.3d 266, 269 (Wyo.2009), we stated, in the context of a parental rights termination case, "fitness includes the ability to meet the ongoing physical, mental and emotional needs of the child." Finding Mother was unfit to have custody and control of the children, the district court correctly stated that the same factors which supported a finding that the children's health and safety would be seriously jeopardized if they were returned to Mother supported a finding that she was unfit. See, e.g., MN, ¶¶ 28-33, 78 P.3d at 238-39; CL, ¶ 12, 151 P.3d at 1106 (considering the last elements of subsections (iii) and (v) together). However, the district court also found that the youngest child, RMR, has a serious medical condition that requires close monitoring and failure to meet her special needs would place her at greater risk. At the time DFS took the children into custody, ACR's and RMR's weights were low for their ages. While they were in foster care their percentiles raised significantly, indicating that their environment played a strong role in their overall health conditions. Given that history and Mother's drug use, it was understandable that the district court would be concerned RMR's medical condition may not be sufficiently monitored or treated by Mother. The district court properly found there was clear and convincing evidence that Mother's parental rights should be terminated under § 14-2-309(a)(v).
[¶ 36] Affirmed.
NOTES
[1] The parental rights of the fathers of ARC and RMR were also terminated.